Rachel F. Preiser (RFP 7953)
National Labor Relations Board
Region 2
26 Federal Plaza, Room 3614
New York, New York 10278-0104
(212) 264-0300

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------X

**CELESTE J. MATTINA, Regional Director,**
**Region 2 of the National Labor**
**Relations Board, for and on behalf of**
**The NATIONAL LABOR RELATIONS BOARD,**

                    **Petitioner**

              **v.**

**C & W CLEANING SERVICE, INC.,**

                    **Respondent**

----------------------------------------X

JUDGE LYNCH

08 CV 1808

08 Civ._____
J._____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PETITION FOR TEMPORARY INJUNCTION UNDER SECTION 10(J)**
**OF THE NATIONAL LABOR RELATIONS ACT**

# TABLE OF CONTENTS

I.   STATEMENT OF THE CASE ....................................... 1
II.  PROCEDURAL POSTURE .......................................... 2
III. FACTS ....................................................... 3
IV.  STATUTORY STANDARD FOR INJUNCTIVE RELIEF ................... 8
V.   REASONABLE CAUSE ANALYSIS ................................... 9
     A.  Overview ............................................... 9
     B.  The Section 8(a)(3) Allegations: Respondent's Refusal to
     Hire the Union-Represented Workers. ........................ 10
     C.  The Section 8(a)(5) Allegations: Respondent's Refusal to
     Recognize and Bargain with the Union and Its Unlawful Changes
     in Working Conditions. ..................................... 16
VI.  JUST AND PROPER ANALYSIS ................................... 21
     A.  Interim Instatement, Interim Restoration of the Prior
     Working Conditions, and an Interim Bargaining Order Are All
     Necessary to Protect the Board's Remedial Powers ........... 21
     B.  Respondent Defenses ................................... 27
VII. CONCLUSION AND REMEDY ..................................... 31

## TABLE OF AUTHORITIES

**Supreme Court Cases**

*NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272 (1972) ........................................................ 18

*Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987).. .................................................... 18, 19, 26

**Federal Cases**

*Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744 (9th Cir. 1988), overruled on other grounds, *NLRB v. California Pacific Medical Center*, 19 F.3d 449 (9th Cir. 1994)...................... 28

*Asseo v. Centro Medico del Turabo*, 900 F.2d 445 (1st Cir.1990).. ..................................................... 23, 25

*Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270 (7th Cir. 2001)... ......................................... 22, 23, 24, 26, 30

*Chester v. CMPJ Enterprises*, 2007 WL 1994045 (D.Minn. 2007)... 22

*Crawford v. Environmental Waste Disposal, Inc.*, 568 F.Supp. 22... (N.D. Ill. 1983) ........................................... 27

*Danielson v. Joint Board of Coat, Suit and Allied Garment Workers' Union (ILGWU)*, 494 F.2d 1230 (2d Cir. 1974) .......... 9

*Donner v. NRNH, Inc.*, 163 LRRM 2033 (W.D.N.Y. 1999)....... 24, 25

*Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902 (3d Cir. 1981) .................................................. 28

*Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221 (6th Cir. 1993) ... ........................................................ 22, 24

*Fuchs v. Jet Spray Corp.*, 560 F. Supp. 1147 (D. Mass. 1983) ..... 9

*Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360 (2d Cir. 2001)........................................... 24, 26, 27, 30

*I.U.O.E. v. NLRB (Tiidee Products, Inc.)*, 426 F.2d 1243 (D.C. Cir.), cert. denied 400 U.S. 950 (1970)................. 24, 26

*Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047 (2d Cir. 1980) ... ....................................... 8, 9, 10, 21, 29, 31

*Kaynard v. Mego Corp.*, 633 F.2d 1026 (2d Cir. 1980) ......... 9, 21

*Kobell v. United Refining Co.*, 159 LRRM 2762 (W.D. Pa. 1998) ... 27

*Levine v. C & W Mining Co.*, 465 F.Supp. 690 (N.D. Ohio 1979)... 23

*McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237 (2d Cir. 1962).................. 9

*Morio v. North American Soccer League*, 632 F.2d 217 (2d Cir. 1980) ....................................................... 21, 25

*NLRB v. California Pacific Medical Center*, 19 F.3d 449 (9th Cir. 1994)........................................................ 28

*NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559 (7th Cir. 1996).... 9, 28

*NLRB v. Staten Island Hotel Limited Partnership*, 101 F.3d 858 (2d Cir. 1996).................................................. 13

*Overstreet v. Thomas Davis Medical Centers, P.C.*, 9 F.Supp.2d 1162 (D. Ariz. 1997) .......................................... 28

*Penello v. United Mine Workers*, 88 F.Supp. 935 (D. D.C. 1950) .. 28

*Pye v. Excel Case Ready*, 238 F.3d 69 (1st Cir. 2001)........ 22, 28

*Saks & Company v. NLRB*, 634 F.2d 681 (1980) ..................... 18

*Scott v. El Farra Enterprises*, 863 F.2d 670 (9th Cir. 1988)....... ....................................................... 23, 24

*Scott v. Stephen Dunn & Associates*, 241 F.3d 652 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Seeler v. The Trading Port, Inc.*, 517 F.2d 33 (2d Cir. 1975). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 21, 28

*Silverman v. JRL Food Corp.*, 196 F.3d 334 (2d Cir. 1999) . . . . . . . . 8

*Silverman v. Major League Baseball Player Relations Comm., Inc.*, 880 F.Supp. 246 (S.D.N.Y.), aff'd 67 F.3d 1054 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 25

*Silverman v. Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Southwest Forest Industries, Inc. v. NLRB*, 841 F.2d 270 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Cases**

*Aitoo Painting Corp.*, 238 NLRB 366 (1978) . . . . . . . . . . . . . . . . . . . . 4

*Allied Aviation Fueling of Dallas, LP*, 347 NLRB No. 22 (2006). 11

*CGLM, Inc.*, 350 NLRB No. 77 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Deaconess Medical Center*, 314 NLRB 677 (1994) . . . . . . . . . . . . . . . . . 19

*E.S. Sutton Realty, Co.*, 336 NLRB 405 (2001) . . . . . . . . . . . . . . . . . . 16

*Florida-Texas Freight, Inc.*, 203 NLRB 509 (1973), enfd. 489 F.2d 1275 (6th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*GFS Building Maintenance Inc.*, 330 NLRB 747 (2000) . . . . . . . . 13, 19

*Gilston Electrical Contracting Corp.*, 304 NLRB 124 (1991) . . . . . . 4

*JLL Restaurant, Inc. d/b/a Smoke House Restaurant*, 347 NLRB No. 16 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 20

*Love's Barbeque Restaurant No. 62*, 245 NLRB 78 (1979), enf'd in relevant part 640 F.2d 1094 (9th Cir. 1981) . . . . . . . . . . 17, 19, 20

*Manno Electric*, 321 NLRB 278 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*MSK Corp.*, 341 NLRB 43, 45 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Paramus Ford, Inc.*, 351 NLRB No. 53 (2007) . . . . . . . . . . . . . . . . . . . . 20

*Phoenix Transit System*, 337 NLRB 510 (2002) . . . . . . . . . . . . . . . . . . . 11

*Planned Building Services, Inc.*, 347 NLRB No. 64 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 17, 20

*Rainbow Shops, Inc.*, 303 NLRB 78 (1991) . . . . . . . . . . . . . . . . . . . . . . . 16

*Sierra Realty Corp.*, 317 NLRB 832, 835 (1995), enf. denied on other grounds, 82 F.3d 494 (D.C. Cir. 1996) . . . . . . . . . . . . . . . . . 19

*Smith & Johnson Construction Co.*, 324 NLRB 970 (1997) . . . . . . . . 21

*State Distributing Co.*, 282 NLRB 1048 (1987) . . . . . . . . . . . . . . . . . . 16

*Staten Island Hotel Limited Partnership*, 318 NLRB 850 (1995), enfd. 101 F.3d 858 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sunland Construction Co., Inc.*, 311 NLRB 685 (1993) . . . . . . . . . . . . 16

*U.S. Marine*, 293 NLRB 669, 670 (1989) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Weco Cleaning Specialists, Inc.*, 308 NLRB 310 (1992) . . . . . . . . . . 19

*Wright Line*, 251 NLRB 1083 (1980), enfd., 662 F.2d 899 (1st Cir. 1981), cert. denied 455 U.S. 989 (1982), approved in *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983) . . . . . . . . 11

**Statutes**

29 U.S.C. § 152 (2), (6) and (7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

29 U.S.C. § 157 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

29 U.S.C. § 158(a)(1) ..........................................1
29 U.S.C. § 158(a)(3) .......................................1, 10
29 U.S.C. § 158(a)(5) .......................................1, 17
29 U.S.C. § 160(j) ............................................1

## I. **STATEMENT OF THE CASE**

Celeste J. Mattina, Regional Director for Region 2 of the National Labor Relations Board, herein called the Board, has petitioned this court, for and on behalf of the Board, pursuant to Section 10(j) of the National Labor Relations Act, (61 Stat. 149; 29 U.S.C. Sec. 160(j)), herein called the Act, for appropriate injunctive relief pending the final disposition of the matters involved herein pending before the Board on the Amended Complaint and Notice of Hearing of the General Counsel of the Board in Case No. 2-CA-38343, alleging that C & W Cleaning Service, Inc., herein Respondent or C & W or the Employer, has engaged in, and is engaging in, unfair labor practices in violation of Section 8(a)(1), (3) and (5) of the Act.

The petition herein is predicated on Petitioner's conclusion that there is reasonable cause to believe that Respondent has engaged in the unfair labor practices charged. Having reached this conclusion, the Board is authorized under Section 10(j) of the Act to petition the Court for a temporary injunction against the continuation of such unfair labor practices, and the Court has jurisdiction to grant such relief when it is deemed to be just and proper.

In the instant case, the belief that Respondent has violated the Act as alleged is based upon the below-summarized evidence, which is supported by testimony and exhibits adduced at a formal hearing before an Administrative Law Judge conducted on

February 8 and 11, 2008.   The transcript and exhibits of the hearing are attached to the petition as Exhibit A.

Interim injunctive relief is necessary to prevent Respondent from achieving its unlawful objective, to protect the Board's remedial powers, and to further the Act's purpose of promoting peaceful collective bargaining.

## II.   PROCEDURAL POSTURE

On July 9, 2007 Local 32BJ, SEIU, herein Local 32BJ or the Union, filed an unfair labor practice charge in Case No. 2-CA-38343, which was served the following day on Respondent.   (G.C. Exh. 1(a)-(b).)[1]   The charge was amended on August 2, 2007, and served on Respondent on August 6, 2007, and a second amended charge was filed on September 25, 2007, and served on Respondent on October 2, 2007.   (G.C. Exh. 1(c)-(f).)   As amended, the charge alleged, *inter alia*, that Respondent violated Section 8(a)(1), (3), and (5) of the Act by refusing to hire incumbent, Union-represented cleaning workers at the City of New York Human Resources Administration offices located at 330 West 34th Street in Manhattan in order to avoid its successorship obligations, refusing to recognize and bargain with the Union, and unilaterally implementing changes to employees' terms and conditions of employment.

On November 30, 2007, the Region issued a Complaint and Notice of Hearing in this matter, alleging, *inter alia*, that Respondent violated Section 8(a)(1), (3) and (5) of the Act by

2

refusing to hire incumbent, Union-represented cleaning workers at the City of New York Human Resources Administration offices located at 330 West 34th Street in Manhattan; refusing to recognize and bargain with the Union; and unilaterally implementing changes to employees' terms and conditions of employment. (G.C. Exh. 1(g).). Respondent filed an Answer to the Complaint, (G.C. Exh. 1(k)), and the case was heard by Administrative Law Judge Eleanor MacDonald on February 8 and 11, 2008.[2]

Petitioner now seeks interim injunctive relief to protect the Union's status as the employees' collective bargaining representative and to preserve the Board's ability to remedy Respondent's unfair labor practices. In particular, Petitioner seeks the interim instatement of the discriminatees, an interim bargaining order, rescission of the unilateral changes to terms and conditions of employment implemented by Respondent without notice to or bargaining with the Union, and a broad cease and desist order.

### III. **FACTS**

Respondent is a cleaning services contractor engaged in providing cleaning services to other businesses and government agencies, with its office and place of business located at 309

---

[1] All references are to the Transcript and Exhibits contained in Exhibit A unless otherwise indicated.
[2] An Amended Complaint issued on January 22, 2008, which, *inter alia*, named Aurel Culi, a long-term temporary replacement employee, as an additional discriminatee. (GC Exh. 1(l), para. 9(a).) Respondent filed an Answer to the Amended Complaint on February 4, 2008. (GC Exh. 1(p).)

Lafayette Avenue in Brooklyn.    (GC Exhs. 1(l), para. 2(a); 1(p), para. 2.)    Respondent annually performs services for the City of New York Human Resources Administration (HRA) valued in excess of $50,000.    (GC Exhs. 1(l), paras. 2, 3; 1(p), para. 2(b); Tr. at 6:1-15)[3]    Respondent is not a signatory to a contract with any union.    (Tr. at 14:7-13 (Campbell).)    In or about the end of June, Respondent received a letter from HRA dated June 25 indicating that Respondent had been awarded the cleaning work at HRA's offices located at 330 West 34th Street.    (GC Exh. 2.)

    The Union represented a bargaining unit of janitorial workers (Unit employees) employed by Triangle Corporation at the HRA offices at 330 West 34th Street in Manhattan.[4]    (Tr. at 46:7-16 (Johnston); GC Exh. 8.)    The Union also represented Triangle's janitorial employees at other buildings.    (Tr. at 45:6-11 (Johnston).)    Triangle and the Union were signatories to a multiemployer collective-bargaining agreement that was in effect from 2004 to October 2007.    (GC Exh. 7; Tr. at 45:10-23 (Johnston).)[5]

    In late June, HRA awarded the cleaning contract for 330 West 34th Street to C & W.    (GC Exh. 2; Tr. at 14:17-15:2

---

[3] In light of its provision of services to the City of New York, which is in commerce, Respondent is engaged in commerce within the meaning of the National Labor Relations Act.    29 U.S.C. § 152 (2), (6), and (7); see *Gilston Electrical Contracting Corp.*, 304 NLRB 124, 125 (1991); *Aitoo Painting Corp.*, 238 NLRB 366, 367 (1978).

[4] At all relevant times, one Unit employee (Perparim Kaba) was out on disability, and a long-term temporary replacement employee filled his position.    Accordingly, although there are only 11 bargaining unit positions at 330 West 34th Street, the bargaining unit consists of 12 janitorial employees.

[5] All dates are in 2007 unless otherwise stated.

4

(Campbell).)  On June 28 at 10:00 am, Deputy Commissioner of HRA Fern Vasile met with C & W's Owner Harold Campbell and informed him that HRA required C & W to begin work at the building on July 2.  (GC Exh. 12; Tr. at 16:6-12; 17:10-14 (Campbell); 109:14-22; 113:8-11 (Vasile).)  Deputy Commissioner Vasile also informed Mr. Campbell that the Unit employees were represented by the Union. (Tr. at 111:22-112:12,23-25; 113:12-23 (Vasile).)

Instead of considering the Unit employees for hire, Mr. Campbell and Respondent's Vice President of Operations James Blackwell hurriedly recruited workers and, on June 29, hired 11 new employees to begin work at 330 West 34th Street on Monday, July 2.  (Tr. at 123:8-22; 125:7-23 (Blackwell); 149:5-22, 150:2-8;  22:8-25:25  (Campbell).)   Vice  President  of  Operations Blackwell admitted that Respondent hired "non qualified workers" who were "a little bit out of our range" in that they had no previous janitorial experience.  (Tr. at 125:16-23 (Blackwell).)

Regarding  Respondent's  hiring  practices  and  company policies, Campbell testified that he never posts help-wanted advertisements or other announcements when he needs workers, and that it is instead his practice to maintain and hire from an applicant  file  composed  of  former  Respondent  employees  and individuals who call the office for work or submit resumes.  (Tr. 21:2-6;  22:20-23:5  (Campbell).)   Respondent  hires  additional workers  as  necessary  through  DOL,  America  Works,  or  Brooklyn Bureau Agency for the Disabled. (Tr. at 22:12-19 (Campbell).) Vice  President  of  Operations  Blackwell  admitted  that  because

Respondent's offices are located in a residential building with a security guard, applications for work cannot be sought by visiting Respondent's premises but only by telephone. (Tr. at 135:3-136:11 (Blackwell).)    In its 18 years of operation, Respondent has never employed workers who were represented by a union.   (Tr.   at 14:10-13 (Campbell).)   In fact, Respondent's Company policies and regulations, which Campbell concedes were expanded and distributed to employees prior to the commencement of the HRA work on July 2, specifically state: "C & W is a non-Union company.    There will be Union Reps at your work site soliciting you to join the Union (Remember C & W is a non-Union shop)."    (GC  Exh.  6  para.  12;  Tr.  at  35:2-20,  160:23-161:4 (Campbell).)   The penalty for non-compliance with these policies is termination.  (GC Exh. 6 para. 15)

On  July  3  a  Union  representative,  who  had  repeatedly attempted to contact C & W by telephone to inquire about jobs for the Unit employees, reached a woman who stated that C & W was "not union" and preferred to hire its own people.   (Tr. at 59:2-25; 60:6-61:3 (Aldebol).)   Also on July 3, the Unit employees and a  Union  representative  finally  located  C  &  W  owner  Harold Campbell at the job site, delivered a letter of application that the Unit employees had signed, and spoke with Campbell about obtaining jobs at 330 West 34th Street. (GC Exhs. 9 & 10; Tr. at 69:22-71:7;  75:4-15;  76:5-11;  77:5-11  (Graham).)    Campbell responded that C & W did not need any more employees; that C & W was a non-union company; and that, if the Union could get him

6

additional contracts maybe they could talk but that if he was going to deal with a union it would be Local 2. (Tr. at 76:5-21 (Graham); 90:23-91:16 (Bekteshi).) Despite notice of the Unit employees' desire for employment, Campbell admits that he subsequently hired at least three additional non-Unit employees to work at 330 West 34th Street on July 16 and July 26. (Tr. at 40:1-22; 153:2-9 (Campbell).)

On August 20, C & W owner Campbell sent a letter to the Board's Manhattan Regional office admitting that he did not hire the Unit employees because C & W is a "non-union" company. The letter also declared that C & W "does not plan to hire union workers in the future." (GC Exh. 3.) In the Answer to the Amended Complaint, Respondent's counsel further stated that C & W would not have hired the predecessor employees because there was no realistic possibility of reaching any kind of agreement with the Union. (GC Exh. 1 (p), Affirmative Defenses, para. 10.)[6]

The ALJ hearing occurred on February 8 and 11, 2008.

---

[6] It appears that in early August most of the Unit employees exercised their bumping rights under the multiemployer contract and obtained janitorial positions at other Triangle work locations covered by the multiemployer contract. At least one employee testified that, at his new location, he is the employee with the lowest "building seniority." (Tr. at 91:23-25 (Bekteshi).) Building seniority governs employees' vacation scheduling, bidding on vacant shifts or positions, and layoff order. (GC Exh. 7, Art. XIV (11), (12), and (17); Tr. at 92:1-4 (Bekteshi).) Based on the Union's representation and information from several Unit employees, it appears that the Unit employees desire to return to work at 330 West 34th Street.

7

## IV.    STATUTORY STANDARD FOR INJUNCTIVE RELIEF

Section 10(j) of the Act authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings. Congress recognized that the Board's administrative proceedings often are protracted. In many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint and thereby render a final Board order ineffectual. *See Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1055 (2d Cir. 1980); *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 38 (2d Cir. 1975), citing S.Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), reprinted at *Legislative History of the Labor Management Relations Act of 1947*, 44, 433 (Government Printing Office 1985). Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation. *See, e.g., Seeler v. The Trading Port, Inc.*, 517 F.2d at 37-38.

To resolve a Section 10(j) petition, a district court in the Second Circuit considers only two issues: whether there is "reasonable cause to believe" that a respondent has violated the Act and whether temporary injunctive relief is "just and proper." *See, e.g., Silverman v. J.R.L. Food Corp., d/b/a Key Food*, 196 F.3d 334, 335 (2d Cir. 1999) and the cases cited therein.

## V. REASONABLE CAUSE ANALYSIS

### A. Overview

In determining whether there exists reasonable cause to believe that the Act has been violated, the district court may not decide the merits of the case. *See Kaynard v. Mego Corp.,* 633 F.2d 1026, 1032-1033 (2d Cir. 1980). Rather, the court's role is limited to determining whether there is "reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals." *Kaynard v. Mego Corp., supra* at 1033, *quoting McLeod v. Business Machine and Office Appliance Mechanics Conference Board*, 300 F.2d 237, 242 n.17 (2d Cir. 1962). The district court should not resolve contested factual issues; the General Counsel's version of the facts "should be given the benefit of the doubt," *Seeler v. The Trading Port, Inc.,* 517 F.2d at 37, and together with the inferences there from, "should be sustained if within the range of rationality." *Kaynard v. Mego Corp., supra* at 1031. The district court also should not attempt to resolve issues of credibility of witnesses. *Kaynard v. Palby Lingerie, Inc.,* 625 F.2d at 1051-1052 n. 5. *See also NLRB v. Electro-Voice, Inc.,* 83 F.3d 1559, 1570, 1571 (7th Cir. 1996), *cert. denied* 519 U.S. 1055 (1997); *Fuchs v. Jet Spray Corp.,* 560 F. Supp. 1147, 1150-1151 n. 2 (D. Mass. 1983), *aff'd per curiam* 725 F.2d 664 (1st Cir. 1983).

Similarly, on questions of law, the district court "should be hospitable to the views of the [General Counsel], however novel." *Kaynard v. Mego Corp., supra* at 1031, *quoting Danielson*

*v. Joint Board of Coat, Suit and Allied Garment Workers' Union
(ILGWU)*, 494 F.2d 1230, 1245 (2d Cir. 1974). The General
Counsel's legal position should be sustained "unless the
[district] court is convinced that it is wrong." *Kaynard v.
Palby Lingerie, Inc.*, 625 F.2d at 1051. *Accord, Silverman v.
Major League Baseball Player Relations Comm., Inc.*, 67 F.3d 1054,
1059 (2d Cir. 1995) ("appropriate deference must be shown to the
judgment of the NLRB and a district court should decline to grant
relief only if convinced that the NLRB's legal or factual
theories are fatally flawed").

As described below, reasonable cause exists to believe that
Respondent violated Section 8(a)(1), (3) and (5) of the Act by
refusing to hire the incumbent Union-represented workers at 330
West 34th Street, refusing to recognize and bargain with the
Union, and unilaterally implementing changes to employees' terms
and conditions of employment.

## B. The Section 8(a)(3) Allegations: Respondent's Refusal to Hire the Union-Represented Workers.

Section 8(a)(3) of the Act provides, in pertinent part,
that it is an unfair labor practice for an employer "by
discrimination in regard to hire or tenure of employment or any
term or condition of employment to encourage or discourage
membership in any labor organization." 29 U.S.C. §158(a)(3). The
credible evidence establishes that Respondent violated Section
8(a)(3) of the Act by refusing to hire the incumbent Union
represented employees at 330 West 34th Street when it assumed the
janitorial work at that location.

The Board generally applies the analytical framework laid out in *Wright Line*, 251 NLRB 1083 (1980), *enfd.*, 662 F.2d 899 (1st Cir. 1981), *cert. denied* 455 U.S. 989 (1982), *approved in NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983), in addressing an allegation that a would-be successor employer refused to hire the predecessor's employees because of their union affiliation in violation of Section 8(a)(3) and (1) of the Act. *Planned Building Services, Inc.*, 347 NLRB No. 64 (2006). Under *Wright Line*, the Board must demonstrate that the employees were engaged in protected activity, that the employer had knowledge of such activity, that the employer exhibited animus or hostility toward that activity, and that the employee's protected activity was a "motivating factor" in the employer's decision to take adverse action against the employee. *Wright Line*, 251 NLRB at 1089; *Manno Electric*, 321 NLRB 278, 281 (1996).[7]

The evidence adduced at the hearing clearly establishes that the incumbent employees at 330 West 34th Street engaged in union activity by virtue of their membership in and support of the Union. (GC Exhs. 8-10; Tr. at 46:7-16 (Johnston); 83:3-7 (Bekteshi).) Moreover, the testimony of Deputy Commissioner of

---

[7] This showing of unlawful motive having been made, the burden then ordinarily shifts to the employer to establish that it would have taken the same action even absent the employee's protected activity. Id. However, where as here an employer admits that its adverse action was motivated by an employee's protected activity, the burden shifting aspect of *Wright Line* is inapplicable. See *Allied Aviation Fueling of Dallas, LP*, 347 NLRB No. 22, slip op. at 1 fn. 2 (2006) and *CGLM, Inc.*, 350 NLRB No. 77, slip op. 1 at fn. 2 (2007) (citing *Phoenix Transit*

HRA Fern Vasile, who met with C & W's Owner Harold Campbell after Respondent was awarded the cleaning work at 330 West 34th Street, makes clear that Mr. Campbell knew of the Unit employees' union activity before he commenced hiring.    (Tr. at 111:22-112:12, 23-25, 113:12-25 (Vasile).)    It is similarly clear, for reasons discussed below, that Campbell's entire mode of hiring and his hiring decisions regarding 330 West 34th Street were motivated by a desire to avoid any potential obligation to deal with the Union.

The Board considers the following factors in assessing whether a successor employer refusal to hire the employees of a predecessor was unlawfully motivated:    "substantial evidence of union animus, lack of a convincing rationale for refusal to hire the predecessor's employees; inconsistent hiring practices or overt acts or conduct evidencing a discriminatory motive; and evidence supporting a reasonable inference that the new owner conducted its staffing in a manner precluding the predecessor's employees from being hired as a majority of the new owner's overall work force to avoid the Board's successorship doctrine [citations omitted]."    *U.S. Marine*, 293 NLRB 669, 670 (1989).

Here, the evidence of unlawful motive is overt and direct. Thus, Campbell admitted, in an August 20 letter to the Board, that "[t]he reason C & W did not hire any of the former service worker [sic] represented by Local 32BJ, is that our company is

---

*System*, 337 NLRB 510 (2002), enfd. 63 Fed. Appx. 524 (D.C. Cir. 2003).

non-union organization [sic]."   (GC Exh. 3)[8]   In light of this admission, Campbell's assertion that he did not contemplate hiring the Union-represented workers at 330 West 34th Street because the Company could not afford to pay them the prevailing wage rate, much less Union wages and benefits, is not a defense. (Tr. at 149:9-14 (Campbell).)   Rather, these statements are quintessential evidence of unlawful motive.   See *GFS Building Maintenance Inc.*, 330 NLRB 747, 752 (2000) (citing cases); *NLRB v. Staten Island Hotel Limited Partnership*, 101 F.3d 858, 861 (2d Cir. 1996) (per curium) (employer's statements about not being able to survive with a union and not wanting to hire "anybody from the union" supported finding of discriminatory refusal to hire predecessor's employees).

Moreover, the evidence regarding Campbell's company policies and hiring practices strongly suggests that he deliberately operates the company in a manner to avoid having to deal with a union.   Thus, C & W's company policies and rules, distributed to all new hires and carrying a penalty of termination for noncompliance, state that "C & W is a non-union company.   There will be Union Reps at your work site soliciting you to join the Union (Remember C & W is a non-Union shop)."   (GC

[8] Similarly, the woman who answered the phone for C & W on July 3, believed to be Respondent's secretary Angelina Alston, explained to the Union representative who was calling to seek work on behalf of the Unit employees that Respondent was non-union and preferred to hire its own people.   (Tr. at 59:2-25; 60:6-61:3 (Aldebol); 12:23-13:2 (Campbell).)

13

Exh. 6; Tr. at 34:10-12 (Campbell).)[9]    This is entirely consistent with what Campbell told the Unit employees who spoke with him on July 3 about obtaining work and with what the Union representative who called Respondent earlier that day on the workers' behalf was told by the person who answered the telephone. (Tr. at 90:12-17, 24-25; 91:14-16 (Bekteshi); 59:2-25; 60:6-61:3 (Aldebol).)    While Campbell insisted in his testimony that he is ignorant regarding unions, Campbell's protestations of ignorance cannot explain away his admissions to the Board that he did not hire the Local 32BJ workers because he is "a non-union organization" and that he has "no plans to hire any union workers in the near future." (Tr. at 14:7-13; 33:14-18; 156:10-157:4 (Campbell); GC Exh. 3.)    Rather, those admissions and Respondent's express policies establish Respondent's deliberate avoidance of unions in the operation of its business.

Respondent's assertion that Campbell failed to hire the Unit-employees because he assumed that he would have to pay these workers the prevailing wage rate under the terms of his contact with HRA and that this decision was unrelated to their union affiliation is patently unconvincing. (Tr. at 126:8-24; 128:16-129:2; 137:19-138:6 (Blackwell); 145:2-146:3,16-25; 149:9-14; 150:10-151:9; 153:2-15; 154:10-155:18 (Campbell).)    The provision

---

[9]Although it is not clear from the record when this policy was added to the Company's Policies and Regulations, Mr. Campbell admits that he expanded the company's policies on July 2,

of the HRA contract to which Respondent's counsel attempts to tie this assertion indicates that the Respondent is permitted to pay 80 percent of the prevailing wage rate to "new hires" during the first 30 months of their employment but that the provision does not apply to "any experienced employee … who was employed in the New York City building industry…as of February 3, 1996." (GC Exh. 5; Tr. at 136:15-138:6 (Blackwell).) Campbell admitted that he at no time inquired of any of the Union-represented workers whether they had in fact been employed in the industry prior to February 3, 1996 and that he had no reason for believing that to be the case. (Tr. at 157:8-15; 159:16-160:4 (Campbell).) Significantly, Campbell made no reference at all to this provision in his letter to the Board explaining his refusal to hire the Unit employees. (GC Exh. 3.) While it is clear that Campbell sought to avoid what he believed would be the necessity to pay the Union-represented employees at rates beyond what he had bid, it simply is not credible that this motivation was independent of any consideration of the employees' Union affiliation given Campbell's clear admission that he did not hire the Local 32BJ workers because the company is a "non union organization." (GC Exh. 3; Tr. at 154:10-155:6 (Campbell).)

Although the predecessor employees did not succeed in delivering their work application to Respondent until after Respondent had hired an initial complement of workers for the 330

---

specifically in anticipation of taking on the HRA contracts awarded at the end of June. (Tr. at 34:17-35:20 (Campbell).)

15

West 34th Street contract, Respondent's failure to hire these employees nevertheless violated the Act because Campbell's admission that he would not have hired Union-represented workers plainly demonstrates that the Triangle employees' efforts to participate in the application process were futile.    In this regard it is clear from HRA Deputy Commissioner Vasile's testimony that Campbell was informed of the presence of Union workers at 330 West 34th Street before he began hiring and that, in spite of intense time pressure, Campbell deliberately determined not to hire the Unit employees because they were union members to whom  he did not want to pay union wages and benefits. (Tr. at 111:22-112:12, 23-25 (Vasile); GC Exh. 3; Tr. at 143:8-16; 145:4-25; 149:5-14; 153:2-15; 154:10-25; 155:1-3 (Campbell).) See *E.S. Sutton Realty, Co.*, 336 NLRB 405, 408 (2001).  See also *Sunland Construction Co., Inc.*, 311 NLRB 685, 686 (1993) (in refusal-to-hire context, actual application not required where it can be demonstrated that application would have been futile); *Rainbow Shops, Inc.*, 303 NLRB 78, 78 fn. 2, 84 (1991); *State Distributing Co.*, 282 NLRB 1048, 1048 (1987).

The evidence adduced during the hearing before the Administrative Law Judge therefore establishes reasonable cause to believe that the Employer violated Section 8(a)(1) and (3) of the Act by refusing to hire the incumbent Union-represented workers at 330 West 34th Street.

**C. The Section 8(a)(5) Allegations: Respondent's Refusal to Recognize and Bargain with the Union and Its Unlawful**

16

**Changes in Working Conditions.**

Section 8(a)(5) of the Act provides in pertinent part that it is an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees." 29 U.S.C. §158(a)(5). Here, Respondent's violations of Section 8(a)(5) flow directly from its unlawful refusal to hire the predecessor's employees. Thus, the credible evidence establishes that Respondent, by refusing to hire the incumbent Union-represented employees at 330 West 34th Street, sought to avoid any obligation to bargain with the Union that would arise from its status as a successor employer. See *Love's Barbeque Restaurant No. 62*, 245 NLRB 78 (1979), enf'd in relevant part 640 F.2d 1094 (9th Cir. 1981). Moreover, by virtue of the unlawful refusal to hire the incumbent workers Respondent lost any entitlement to set initial terms and conditions of employment at 330 West 34th Street, rendering its changes to the predecessor employer's terms and conditions of employment without notification to or bargaining with the Union a further violation of 8(a)(5). See *Planned Building Services*, 347 NLRB No. 64 (2006), citing *Love's Barbeque Restaurant*, 245 NLRB 78 (1979); *JLL Restaurant, Inc. d/b/a Smoke House Restaurant*, 347 NLRB No. 16 (2006).

The credited evidence makes clear that, but for Respondent's unlawful refusal to hire the incumbent employees, it would have been a successor employer and as such required to bargain with the Union as the exclusive collective bargaining representative for the unit of all workers performing cleaning

17

work for HRA at 330 West 34th Street. *NLRB v. Burns International Security Services, Inc.*, 406 U.S. 272, 281 (1972). There are two components to the analysis of whether the circumstances for a *Burns* successorship are met:  (1) continuity of operations, and (2) continuity of workforce. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987); *Saks & Company v. NLRB*, 634 F.2d 681, 684 (1980). Both components are satisfied in this case.

The factors that the Board considers in determining the necessary continuity of operations are "whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production processes, produces the same products, and basically has the same body of customers." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. at 43. Such continuity is to be assessed from the perspective of the employees. *Id.* Here, the "continuity of operations" prong is easily met. The predecessor employees mopped, vacuumed, cleaned bathrooms, swept floors, dusted, removed trash and performed basic office cleaning work. (Tr. at 82:6-23 (Bekteshi).) Respondent was contracted to perform the same basic cleaning work at the same location for the same customer with no hiatus in the work. (Tr. at 114:7-11 (Vasile); GC Exhs. 4 & 11.) The Board has repeatedly found the continuity of operations necessary to establish a *Burns* successorship in similar cases involving cleaning contractors. See *Weco Cleaning Specialists, Inc.*, 308 NLRB 310 (1992); *Sierra*

*Realty Corp.*, 317 NLRB 832, 835 (1995), enf. denied on other grounds, 82 F.3d 494 (D.C. Cir. 1996).[10]

The continuity of workforce prong of the *Burns* analysis is satisfied where "a majority of the new employer's workforce, in an appropriate unit, consists of the predecessor's employees at a time when the successor has reached a 'substantial and representative complement.'" *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. at 43. In order to prevent employers from benefiting from the consequences of their unlawful acts, the Board has concluded that the majority status element of this prong is presumed met where the would-be *Burns* successor has unlawfully refused to hire the predecessor's employees so as to evade the obligations inherent in that status. *Love's Barbeque Restaurant No. 62*, 245 NLRB at 78. As discussed above, the evidence establishes that that is what occurred in this case. (GC Exh. 3.) As for the appropriate unit element of this prong, the employees at 330 West 34th Street constitute a single location unit that is presumptively appropriate (GC Exhs. 8, 10 & 11). *Sierra Realty Corp.*, 317 NLRB 832, 835 (1995), enf. denied on

---

[10] It is true that the predecessor workers had different off-site supervisors than Respondent's employees; however, lack of continuity in supervision cannot in itself defeat the finding of *Burns* successorship. See *GFS Building Maintenance, Inc.*, 330 NLRB at 752 (citing Sierra Realty, 317 NLRB at 835). As for other changes to terms and conditions of employment, such as pay and benefits, these changes are part and parcel of Respondent's alleged unlawful conduct and cannot be considered to undermine a finding of "continuity of operations" here. See *Deaconess Medical Center*, 314 NLRB 677, 680 (1994).

other grounds, 82 F.3d 494 (D.C. Cir. 1996).  Thus, the evidence
establishes that Respondent is a *Burns* successor.

Finally, although a *Burns* successor ordinarily is entitled
to set initial terms and conditions of employment, the Board has
found that the successor loses that privilege by engaging in
unlawful conduct, including a refusal to hire the predecessor's
employees because of their union affiliation.  See *Planned
Building Services*, 347 NLRB No. 64, citing *Love's Barbeque
Restaurant*, 245 NLRB 78 (1979); *JLL Restaurant, Inc. d/b/a Smoke
House Restaurant*, 347 NLRB No. 16 (2006); *Staten Island Hotel
Limited Partnership*, 318 NLRB 850, 853 (1995) (citing cases),
enfd. 101 F.3d 858 (2d Cir. 1996).  Here, Campbell decreased
wages and benefits upon taking over the work at 330 West 34th
Street without notice to or bargaining with the Union.  (GC Exhs.
4, 5, 7 & 11; Tr. at 29:3-30:24; 31:1-33:18 (Campbell); 51:13-
54:20 (Johnston).)  In light of its allegedly unlawful refusal to
hire or consider for hire the predecessor's employees, Respondent
unlawfully implemented unilateral changes when it established
initial terms and conditions of employment different from those
in place at the time it took over the work.[11]

---

[11] Respondent nevertheless asserts in its Answer that it has not
unlawfully refused to bargain because the Union never made a
clear or timely request for bargaining. (GC Exh. 1(p), paras. 8 &
9 (Affirmative Defenses).)  However, the application letter
presented to Campbell on July 2 serves as a request for
bargaining by the Union.  *Paramus Ford, Inc.*, 351 NLRB No. 53
(2007) (citing, inter alia, MSK Corp., 341 NLRB 43, 45 (2004)).
Moreover, "no bargaining demand was necessary because
Respondent's unlawful refusal to hire … its predecessor's

## VI. JUST AND PROPER ANALYSIS

The Second Circuit has recognized that Section 10(j) is among those "legislative provisions calling for equitable relief to prevent violations of a statute" and courts should grant interim relief thereunder "in accordance with traditional equity practice, as conditioned by the necessities of public interest which Congress has sought to protect." *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980), *quoting Seeler v. The Trading Port, Inc.*, 517 F.2d at 39-40. In applying these principles, the Second Circuit has concluded that Section 10(j) injunctive relief is warranted where serious and pervasive unfair labor practices threaten to render the Board's processes "totally ineffective" by precluding a meaningful final remedy, *Kaynard v. Mego Corp.*, 633 F.2d at 1034 (discussing *Seeler v. The Trading Port, Inc.*, 517 F.2d at 37-38), or where the passage of time might otherwise allow the respondent to accomplish its unlawful objective before being placed under any legal restraint. *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d at 1055. *Accord, Silverman v. Major League Baseball Player Relations Comm., Inc.*, 880 F.Supp. 246, 255 (S.D.N.Y. 1995), *aff'd* 67 F.3d 1054 (2d Cir. 1995).

### A. Interim Instatement, Interim Restoration of the Prior Working Conditions, and an Interim Bargaining Order Are All Necessary to Protect the Board's Remedial Powers

Section 10(j) injunctive relief is warranted in the present case, where Respondent, through its egregious unfair labor

---

employees rendered any request for bargaining futile." *Smith & Johnson Construction Co.*, 324 NLRB 970 (1997).

practices, has already very nearly accomplished its unlawful objective. By refusing to hire the Union-represented workers, Respondent has effectively obliterated the Unit. Without an interim instatement order, the Union will have been deprived of its original base of support at 330 West 34th Street, a loss that a Board Order in due course may be unable to repair. See *Chester v. CMPJ Enterprises*, 2007 WL 1994045 (D.Minn. 2007) (interim instatement, bargaining order, and rescission of unilateral changes appropriate in <u>Kallmann</u> successor 10(j) case). Thus, although all of the discriminatees continue to desire to be employed at their former workplace, there is a distinct danger that, with the passage of time, these employees, who now work at other locations, will become reluctant to return to their former jobs rendering a Board instatement order ineffectual. See, e.g., *Bloedorn v. Francisco Foods*, 276 F.3d 270, 299 (7th Cir. 2001); *Pye v. Excel Case Ready*, 238 F.3d 69, 75 (1st Cir. 2001); *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221 (6th Cir. 1993) (injunction necessary to prevent employees discriminatorily denied employment from "scattering to the four winds" before Board order issues). Or, the employees who have started work at new locations may begin to feel the loss of building seniority and its associated contractual benefits[12] and predictably will

---

[12] Under the collective bargaining agreement in place under the predecessor employer, building seniority rights apply to vacation scheduling, bidding on vacant positions, and reductions-in-force or layoffs. (GC Exh. 7, Art. XIV (11), (12), and (17); Tr. at 92:1-4 (Bekteshi).)

22

blame the Union, leading to a decline in their support for the Union.   (Tr. at 91:23-25 (Bekteshi).)    In either case, the Union's ability to represent the workers at the site or to establish any kind of collective bargaining relationship with Respondent as a successor employer will have been irreparably undermined.    Indeed, courts have not hesitated to find interim instatement of discriminatees denied hire by a successor to be just and proper.  See, e.g., *Scott v. El Farra Enterprises*, 863 F.2d 670, 676-677 (9th Cir. 1988) (interim instatement relief imposed on successor which had discriminatory plan to refuse to hire predecessor employees to avoid bargaining obligation); *Bloedorn v. Francisco Foods*, 276 F.3d at 298-300 (interim reinstatement ordered where successor discriminatorily refused to hire predecessor's employees); *Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 454 (1st Cir. 1990) (interim reinstatement of single discriminatee against successor employer).

It is clear, however, that interim instatement in the absence of an interim bargaining order would serve little purpose in protecting the efficacy of the Board's final order.  Absent an interim bargaining order, the instated employees may be required to work for years without being covered by a collective bargaining agreement and without the benefits of representation by their chosen collective bargaining representative, a loss that a Board order in due course cannot remedy.  See, e.g., *Levine v. C & W Mining Co.*, 465 F.Supp. 690, 694 (N.D. Ohio 1979) ("the value of the right to enjoy the benefits of union representation

is immeasurable in dollar terms once it is delayed or lost"),
affd. in relevant part 610 F.2d 432, 436-37 (6th Cir. 1979);
*Bloedorn v. Francisco Foods, Inc.*, 276 F.3d at 299. By the time
the Board issues its final bargaining order, the employees
predictably will shun the Union because their working conditions
will have been virtually unaffected by collective bargaining for
several years. See *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d
at 299 (the longer a union "is kept…from working on behalf
of…employees, the less likely it is to be able to organize and
represent those employees effectively if and when the Board
orders the company to commence bargaining"); *I.U.O.E. v. NLRB*,
426 F.2d 1243, 1249 (D.C. Cir. 1970), cert. denied 400 U.S. 950
(1970) ("[w]hen the company is finally ordered to bargain with
the union some years later, the union may find that it represents
only a small fraction of the employees"); *Donner v. NRNH, Inc.*,
163 LRRM 2033, 2049-2051 (W.D.N.Y. 1999) (<u>Kallmann</u> successor's
unlawful refusal to bargain with union and unlawful changes in
terms and conditions of employment predictably would erode
employee support for the union and undermine the Board's ability
to issue a meaningful remedy). For these reasons, the courts
have recognized the pressing need for interim relief where a
successor employer improperly refuses to bargain with the
incumbent union. *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d at
299; *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 369
(2d Cir. 2001); *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221,
1226-1227 (6th Cir. 1993); *Scott v. El Farra Enterprises, Inc.*

24

d/b/a Bi-Fair Market, 863 F.2d at 676-677; *Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d at 454-455.

Interim rescission of Respondent's unilateral changes, upon the Union's request, is also necessary to allow the parties effectively to engage in good faith collective bargaining while the unfair labor practice case is pending before the Board.   See *Silverman v. Major League Baseball Player Relations Committee, Inc.*, 880 F.Supp. at 259 (interim rescission of unilateral change appropriate to "salvage some of the important bargaining equality that existed" prior to violations); *Donner v. NRNH, Inc.*, 163 LRRM at 2050-2051 (restoring predecessor's terms is necessary corollary to issuance of interim bargaining order).   Absent interim relief, Respondent may use restoration of the proper status quo working conditions as "bargaining bait" to force acceptance of its other bargaining proposals.  See *Florida-Texas Freight, Inc.*, 203 NLRB 509, 510 (1973), enfd. 489 F.2d 1275 (6th Cir. 1974).  Accord: *Southwest Forest Industries, Inc. v. NLRB*, 841 F.2d 270, 275 (9th Cir. 1988) (restoration of status quo ensures "meaningful bargaining").   Moreover, if allowed to continue, the unilateral changes in wages and benefits here may severely erode the "prestige and legitimacy" of the Union in the eyes of the employees.   *Morio v. North American Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980).  Because employee support for the Union is necessary for meaningful collective bargaining, the absence of interim rescission of the unilateral changes could render the Board's final bargaining order a nullity.    See

*I.U.O.E. v. NLRB*, 426 F.2d at 1249 (employer "may continue to enjoy lower labor expenses after the order to bargain either because the union is gone or because it is too weak to bargain effectively"). Ordering the Respondent to rescind those changes now, before it is too late, offers the best chance of maintaining the efficacy of the Board's order and preserving employees' collective bargaining rights.

For the reasons explained above, the *status quo* that existed prior to Respondent's unlawful acts can only be preserved by the provision of interim relief. *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d 360, 368-369 (2d Cir. 2001). By deliberately displacing the Union through its unlawfully motivated refusal to hire the incumbent employees, Respondent committed violations that "strike at the heart of the collective bargaining process," *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d at 300, and undermine the very collective bargaining stability that the Board's successorship doctrine is intended to protect. See *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d at 369; see generally *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27 (1987). In the meanwhile, the discriminatees have lost any building seniority rights to which their tenure at 330 West 34th Street would have entitled them had they remained at that location instead of being displaced. (Tr. at 91:23-25; 92:1-4 (Bekteshi); GC Exh. 7, Art. XIV (11), (12), and (17).) Only the restoration of the *status quo ante* through Section 10(j) injunctive relief will reassure employees that their Section 7

rights are more than illusory. *See, e.g., Hoffman v. Inn Credible Caterers, Ltd,* 247 F.3d at 368-369 (immediate bargaining order necessary to restore status quo in case of successor employer's unlawful refusal to hire predecessor union-represented employees); *Crawford v. Environmental Waste Disposal, Inc.,* 568 F.Supp. 22, 27-28 (N.D. Ill. 1983) (reinstatement necessary to preserve the base of union support among the employees); *Kobell v. United Refining Co.,* 159 LRRM 2762, 2767 (W.D. Pa. 1998) (ordering restoration of working conditions in part to protect the union's employee support).

### B. Respondent Defenses

In addition, the balance of hardships clearly favors granting interim relief. Absent interim relief, the employees and Union will suffer the irreparable harms described above. In contrast, Respondent will suffer relatively little harm if injunctive relief is granted.

Concerning interim instatement, Respondent contends that replacement of its current workforce with the discriminatees would severely disrupt its operations and lead to the undesirable consequence of putting the current workforce out of work. As an initial matter, it is clear that any disruption of work at the location posed by the replacement of current workers with those who were unlawfully refused hire is likely to be minimal in light of the discriminatees' years of experience performing the work at this location under the previous contractor. In addition, the instatement order does not interfere with Respondent's managerial

right to discipline or discharge all its employees in a nondiscriminatory fashion. See *Pye v. Excel Case Ready*, 238 F.3d at 75; *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906 (3d Cir. 1981); *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996), cert. denied 519 U.S. 1055 (1997) ("The company always has the legal right to discipline an employee in a nondiscriminatory fashion for improper conduct"). Regarding the displacement of the current workforce, this concern has been deemed subsidiary to the instatement rights of employees unlawfully refused work. See, e.g., *Aguayo v. Tomco Carburetor Co.*, 853 F.2d 744, 750 (9th Cir. 1988), overruled on other grounds, *NLRB v. California Pacific Medical Center*, 19 F.3d 449 (9th Cir. 1994).

With regard to an interim bargaining order, any assertion of undue burden belies the temporary nature of the injunctive relief sought. Section 10(j) does not last forever and would not compel Respondent to agree to any specific term or condition of employment advanced by the Union in negotiations. See *Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) ("there is nothing permanent about any bargaining order... particularly an interim order which will last only until the final Board decision"). Rather, it only requires Respondent to maintain the pre-existing terms and conditions of employment until it has reached a good-faith agreement with the Union or a bona fide impasse. See *Overstreet v. Thomas Davis Medical Centers, P.C.*, 9 F.Supp.2d 1162, 1167 (D.Ariz. 1997); *Penello v. United Mine*

*Workers*, 88 F.Supp. 935, 943 (D. D.C. 1950).[13]   In addition, any
agreement reached between the parties under a Section 10(j)
decree can contain a condition subsequent to take into account
the possibility of the Board's ultimate refusal to grant a final
bargaining order remedy.   See, e.g., *Kaynard v. Palby Lingerie,
Inc.*, 625 F.2d 1047, 1054 (2d Cir. 1980).   Finally, the costs in
terms of time and money spent on collective bargaining is a
burden that falls on both parties and thus does not defeat a
request for an interim bargaining order.   See *Scott v. Stephen
Dunn & Associates*, 241 F.3d 652, 669 (9th Cir. 2001).

Respondent also suggests that Section 10(j) relief would be
unduly burdensome because it would interrupt its operations when
it is possible it will prevail on the merits.   The very ancillary
nature of Section 10(j) includes a possibility that the General
Counsel's complaint may not be sustained by the Board.   To deny
interim relief on this broad proposition would be to write
Section 10(j) out of the Act.   In an appropriate case, where the
Regional Director demonstrates a good likelihood of success on
the merits, the risk of error does not preclude otherwise
appropriate interim relief.   See *Kaynard v. Palby Lingerie, Inc.*,
625 F.2d at 1055 ("The unit determination, like the finding of
the unfair labor practices, might ultimately be set aside by the
Board.   That possibility simply highlights the fact that there

_____

[13] Similarly, as to rescinding the unilateral changes in the
interim, the order would require only that Respondent restore the
status quo pending bargaining in good faith with the Union to an

29

are risks to the carrying out of sound labor law policy whether an interim bargaining order is granted or denied").

As previously stated by the Court, the underlying purposes of 10(j) are to protect employees' statutory collective bargaining rights and the policy of the Act in favor of the free selection of collective bargaining representatives. *Hoffman v. Inn Credible Caterers, Ltd.*, 247 F.3d at 368-369. The delay inherent in Board processes would further compromise the fundamental rights protected by the Act and the policies underlying the Act that Respondent's unlawful conduct has put in jeopardy. Thus, injunctive relief is essential here to protect the public interest by protecting employees' rights to engage in Section 7 activity, preserving the remedial power of the Board, and safeguarding the parties' collective-bargaining process. See, e.g., *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d at 300 ("the interest at stake in a section 10(j) proceeding is 'the public interest in the integrity of the collective bargaining process'…. [t]hat interest is placed in jeopardy when the protracted nature of Board proceedings threatens to circumscribe the Board's ability to fully remediate unfair labor practices").

As a final matter, Petitioner anticipates that Respondent will argue that interim relief is inappropriate where credibility disputes exist. This defense has no merit. The case law is clear that the district courts not only can grant such relief

---

agreement or an impasse concerning any proposed changes and thus does not impose an undue burden on Respondent.

where credibility disputes exist, but that those courts should defer to the Regional Director's interpretation of the evidence so long as it finds support in the record. *See, e.g., Kaynard v. Palby Lingerie, supra*, 625 F.2d at 1051 n.5

### VII. CONCLUSION AND REMEDY

Petitioner therefore seeks an order requiring that, pending the Board's final adjudication of the underlying charge, Respondent cease and desist from refusing to hire employees who support the Union, refusing to recognize and bargain with the Union, and unilaterally changing terms and conditions of employment without notice to and bargaining with the Union. Petitioner further seeks an affirmative order requiring Respondent to instate the discriminatees, recognize and upon request bargain with the Union, and, on request, restore terms and conditions as they were prior to Respondent's unlawful unilateral changes. Specifically, Petitioner requests an order enjoining Respondent from

    (a)     Refusing to hire employees because of their membership in the Union;

    (b)     Refusing to recognize and bargain in good faith with the Union as the exclusive collective bargaining representative of the employees at 330 West 34th Street;

    (c)     Unilaterally changing employees' terms and conditions of employment without notice to or bargaining with the Union; and

    (d)     In any other manner interfering with, restraining or coercing its employees in the rights guaranteed them under Section 7 of the Act.

31

Petitioner further requests an affirmative order requiring Respondent, pending final Board adjudication, to

    (a)   Within five (5) days of the issuance of the Court's Order, offer alleged discriminatees immediate and full interim reinstatement to their former positions of employment and working conditions at 330 West 34th Street in Manhattan, displacing, if necessary, any newly-hired, reassigned and/or transferred employees and, in the event an insufficient number of positions exists to accommodate all the discriminatees, establish a preferential hiring list for such employees and offer, in a nondiscriminatory manner, priority employment exclusively from that list as job openings occur.

    (b)   Upon request, recognize and bargain in good faith with the Union as the exclusive collective-bargaining representative of the Unit, with respect to rates of pay, hours, and other terms and conditions of employment, to agreement or a bona fide impasse, and if an understanding is reached, embody such understanding in a signed agreement;

    (c)   At the Union's request, rescind any or all of the unilateral changes to Unit employees' terms and conditions of employment implemented at the 330 West 34th Street on or after July 2, 2007 or the date Respondent took over the janitorial contract;

    (d)   Post copies of the District Court's opinion and order at 330 West 34th Street, in all locations where employee notices are customarily posted; said postings shall be maintained during the Board's administrative proceedings free from all obstructions or defacements; and agents of the National Labor Relations Board, Region 2 shall be granted reasonable access to the Respondent's facilities to monitor compliance with this posting requirement;

    (e)   Within twenty (20) days of the issuance of the District Court's Order, file with the Court, with a copy submitted to the Regional Director of Region 2 of the National Labor Relations Board, a sworn affidavit from a responsible Respondent official setting forth with specificity the manner in which the Respondent has complied with the terms of this decree.

Dated at New York, New York
February 22, 2008

_Rachel F. Preiser_

Rachel F. Preiser
Counsel for Petitioner
National Labor Relations Board
Region 2
26 Federal Plaza, Room 3614
New York, New York 10278-0104
(212) 264-0300

Ronald Meisburg, General Counsel
Barry J. Kearney, Associate General Counsel
Ellen A. Farrell, Deputy Associate General Counsel
Judith I. Katz, Assistant General Counsel
Karen P. Fernbach, Regional Attorney, Region 2
Donald B. Zavelo, Deputy Regional Attorney, Region 2