Stewart Lee Karlin
Attorney at Law
Attorney for Respondent
9 Murray Street, Suite 4W
New York, New York, 10007
Tel: (212) 732-9450
Fax: (212) 571-9893

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

CELESTE J. MATTINA, Regional Director,
Region 2, National Labor Relations Board,
for and on Behalf of the National Labor
Relations Board,

                Petitioner,

                                                        08 CIV 1808 (GEL)

      -against-


C & W CLEANING SERVICE, INC.,

              Respondent,
-------------------------------------------------------------X


### MEMORANDUM OF LAW IN OPPOSITION TO SECTION 10 (j) RELIEF

    **1.**    **Preliminary Statement**

This memorandum is submitted by Respondent C & W Cleaning Service Inc. in opposition to the Board's request for 10(j) relief.

    **2.**    **Factual Statement**

C & W Cleaning Service is a small cleaning company employing about sixty employees. The company has been in business for more than fifteen years and bids on contracts throughout New

York City. All during this time, C & W Cleaning Service never had to deal with a building that previously had a union workforce. C & W Cleaning Service bid on the work at 330 West 34th Street in August 2006. In August 2007, although not the lowest bidder, (the bidders ahead were disqualified), C & W was awarded the Contract. However, C & W Cleaning Service did not receive a letter from HRA awarding the bid until June 25, 2007 and was not officially awarded the contract until Thursday afternoon, June 28, 2007 with the contract to commence on July 2, 2008.

Mr. Campbell described in detail how the bid amount was arrived at. First, he stated that the bid had to be less than $1,500,000. over a three year period of time. (141-142) This is because if the bid is less than one and half million dollars, the City of New York would waive the requirement to post a performance bond which C & W could not afford to do.(142) Second, C & W reduced it normal profit margin of twenty percent to twelve percent and bid 1.47 million over three years to barely qualify for the bond waiver requirement but causing them to be operating on a razor thin profit margin of twelve percent. (143-144)

Mr. Campbell also described in detail the reasoning why he could not under any circumstances hire the existing work force. The wages are dictated by New York City Code. The prevailing wage of over twenty-six dollars an hour must be paid (including benefits) to each cleaner with one exception that being a new hire could be hired at about 20.94 per hour for the first thirty months of the three year contract. See Government Exhibit 5, page 13 of the bid proposal-4 pages from the last page of the proposal) It states in relevant part:

> **NEW EMPLOYEES: EFFECTIVE FEBRUARY 4, 1996, A NEW HIRE EMPLOYED IN THE PORTER/CLEANER TITLE MAY BE PAID A RATE OF EIGHTY (80%) OF THE HOURLY RATE PUBLISHED ABOVE. UPON COMPLETION OF THIRTY (30) MONTHS OF EMPLOYMENT, THE NEW HIRE SHALL BE PAID THE FULLWAGE RATE. (EMPHASIS SUPPLIED)**

> **THIS PROVISION SHALL NOT APPLY TO ANY EXPERIENCE EMPLOYEE ("EXPERIENCE EMPLOYEE") WHO WAS EMPLOYED IN THE NEW YORK CITY BUILDING INDUSTRY ("INDUSTRY") AS OF FEBRUARY 3, 1996. "EXPERIENCE EMPLOYEE" SHALL BE DEFINED AS A PERSON WHO HAS WORKED FOR THIRTY (30) DAYS IN THE "INDUSTRY" WITHIN THE 24 MONTHS IMMEDIATELY PRECEDING HIRING (EXCLUDING EMPLOYMENT AS A VACATION RELIEF) (emphasis supplied)**

In fact, this exact language is tracked in the Union's very own collective bargaining agreement on pages 74-75 of Government Exhibit 7. It should be noted that the CBA provides its cleaners over thirty dollars per hour with the cost of benefits factored in.

Mr. Campbell testified that his bid of 1.478 million was based on hiring new employees at 80 percent of the prevailing wage and that he could not pay the prevailing wage of over $26.00 per hour and still make a profit. (145-147) In fact he would lose about ninety thousand dollars on the contract. (147) Thus, when he received the award on June 28, 2007, he did not even contemplate hiring the existing work force since his bid was calculated to make a razor thin profit margin only if he hired new employees. The union status of the existing work force was simply irrelevant to Mr. Campbell determination to go outside. The only factor was the requirements of the bid and the exception that allowed C & W to just come in under the 1.5 million threshold when using a new work force. (149)

Further, the successful bidder is provided at least two weeks notice to prepare for the commencement of the job; however, C & W had a meeting, on June 28, 2007 with the Deputy Commissioner of HRA, Ms. Fern Vasile in which C & W Cleaning Service first learned that the job

was going to commence on July 2, 2007. At the meeting, C & W Cleaning Service was offered an additional fifteen work sites but accepted only four sites as this was all C & W Cleaning Service could handle. C & W Cleaning Service was not advised that there had been a union work force present. (149)

At no point prior to July 2, 2007 was C & W Cleaning Service aware that this job site had union workers. (151) In fact, C & W Cleaning Service had bid on countless jobs, over the years, and not once did C & W Cleaning Service have any contact with a unionized workforce at any of the job sites. Due to the extraordinary short amount of time in which to get "up and running", C & W Cleaning Service had a number of resumes on file, and received referrals from the New York State of Labor to fill eleven vacancies. In addition, another eleven workers were hired for the other three job sites. This was less workers than originally on the job site. In addition, the workers would be assigned to work five hour per day. (147-150)

On July 2, 2007, after the entire workforce had already been hired, for the first time, C & W Cleaning Service discovered that they were having difficulty because the workers that C & W Cleaning Service had hired were being blocked by union members. As a result, C & W Cleaning Service ordered his employees to go home. On that day, C & W Cleaning Service spoke with the Deputy Commissioner and was told to call back the next day. The next day (July 3), C & W Cleaning Service was advised to send his workers that he had specifically hired for this job to the building. On July 3, 2007, at the work site, C & W Cleaning Service was approached by the Union representative, (his name was unknown) and was asked why C & W Cleaning Service had not hired any of the union members. C & W Cleaning Service responded that he was completely unaware of the fact that there was a union in place at the building, that he had only a matter of days to get "up and running", that he had already hired his work force which was in place, and that no one from the

Union had contacted him until now. At that time, C & W Cleaning Service took an application from one of the members of the union. C & W Cleaning Service had no further contact with the Union and no one from the Union (representatives) made any effort to contact C & W Cleaning Service to negotiate on behalf of its workers.

### 3. 10(j) relief is not appropriate

Under section 10(j) it is contemplated that a district court grant injunctive relief if the Board establishes reasonable cause to believe that the Act has been violated, and it appears that the remedial purposes of the Act would be frustrated unless [temporary] relief . . . is granted. *NLRB v. Acker Indus., Inc.,* 460 F.2d 649, 652 (10th Cir. 1972)   In order to obtain Section 10(j) relief, the Regional Director must demonstrate in Court that it has "reasonable cause" to believe that the NLRA was violated and that interim relief would be "just and proper" under the circumstances. See, e.g., *Silverman v. Major League Baseball Player Relations Comm., Inc.,* 67 F.3d 1054, 1059 (2nd Cir. 1995);  The analysis may also involve the consideration of "general equitable criteria." *Kaynard v. Mego Corp.,* 633 F.2d 1026, 1033 (2d Cir. 1980). The "reasonable cause" inquiry, like an inquiry into the "likelihood of success on the merits," considers the strength of the Regional Director's position. The "just and proper" inquiry may consider whether interim relief is necessary "to prevent irreparable harm or to preserve the status quo," *Hoffman v. Inn Credible Caterers, Ltd.,* 247 F.3d 360, 368 (2d Cir. 2001);

### A. Reasonable Cause

"'Reasonable cause' to believe that unfair labor practices have occurred is a factual finding." *Bernstein v. Carter & Sons Freightways, Inc.,* 983 F. Supp. 994, 1006 (D. Kan. 1997); *see Gottfried v. Frankel,* 818 F.2d 485, 493 (6th Cir. 1987).  There must be a substantial, non-frivolous, legal theory, implicit or explicit, in the Board's argument, and second, there must be sufficient evidence

to support that theory"); Gottfried, 818 F.2d at 493.

Under 8(a)(1) of the Act it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of their rights to organize, form, join, or assist a labor organization, and through it to bargain collectively. Section 8(a)(3) makes it an unfair labor practice for an employer by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization. Under s 8(a)(5) it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees. When one employer by competitive bidding displaces a union work force, the new employer is under a duty to bargain with the union with which its predecessor bargained if (1) the new employer does not make a "significant change" in the "essential nature" of the business, and (2) "a majority of the new [employer's] employees were employed by the predecessor." *Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27, 41 (1987). Thus, the obligations of successorship depend upon whether "there is 'substantial continuity' between the new and predecessor employers." *Harter Tomato Prods. Co. v. NLRB,* 133 F.3d 934, 937 (D.C. Cir. 1998) (quoting Fall River, 482 U.S. at 43). A new employer is not required to hire the employees of its predecessor, *see Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 261 (1974), but the new employer may not lawfully refuse to hire them because of their union affiliation, see Fall River, 482 U.S. at 40; *NLRB v. Burns Security Services,* 406 U.S. 272, at 280 n.5. (1972) In this case, there was no substantial continuity.

Thus, in determining whether a new employer that did not hire its predecessor's union employees discriminated on the basis of their union membership, one must look to whether C & W Cleaning Service was motivated by anti-union animus. If so, then the new employer cannot escape its obligation to bargain with the union on the ground that the union does not represent a majority

6

of its employees. If the Court concludes that the new employer refused to hire the employees of its predecessor based upon anti-union animus, then the new employer may show as an affirmative defense that "it would have taken the [same] action regardless of the existence of such animus." Id. at 1280; see *NLRB v. Transportation Management Corp.,* 462 U.S. 393, 440-43 (1983); *Laro Maintenance*, 56 F.3d at 228; *Wright Line*, 251 N.L.R.B. 1083, 1089 (1980), enf'd, 662 F.2d 899 (1st Cir. 1981). In other words, "a legitimate business purpose may provide a defense even in the face of anti-union animus." *Elastic Stop Nut*, 921 F.2d at 1280.

In sum, the appropriate analytical framework for a refusal-to-hire-violation in a successorship context is the analysis set forth in *Wright Line,* 251, NLRB 1083 (1980) enfd. 662 F2d 899 (1st Cir. 1981), cert denied 455 U.S. (1982); *NLRB v. Transportation Management Corp.,* 462 U.S. 393 (1983). To establish a violation under Wright Line, the actions were the result of its animus toward union or protected activity. Even if it is shown that the failure to hire was motivated by anti-union animus, C & W Cleaning Service still can show that it would have taken the same action in the absence of protected activity. Thus, the general rule of Burns and its progeny is that a successor employer is, like any non-union employer, free to set the initial terms upon which it offers employment. In the ordinary case the successor's obligation to bargain with the union accrues only when it has hired a "substantial and representative complement" of its work force, *Fall River*, 482 U.S. at 47, 52 (clarifying timing of bargaining obligation), and a majority of those employees were employed by its predecessor or one can show that the work force was not retained to anti union animus. *NLRB v. Burns Security Services,* 406 U.S. 272, 294 (1972)

In the instant case, it respectfully submitted there is no anti union animus. An objective review of the facts must lead to that conclusion. C & W Cleaning Service is relatively small non-union company that has never on prior occasions won a bid where there were union employees. The bid on the job site was made in August 2006. It won the bid on June 28, 2007, met with HRA on

June 28, 2007 and was advised that the job started on July 2, 2007.

Further, the company, followed it normal hiring procedures, as it has done on countless occasions, (the company has been in business for more than 17 years) by hiring employees from applications on file and hiring employees from the Department of Labor. In fact, the circumstances reflect that C & W Cleaning Service was completely unaware that this one building it bid on had union workers already in place. It was only after the work force had already been hired that C & W Cleaning Service had discovered that this had been union workers employed at the job site. Thus, there simply could not have been anti union animus if C & W Cleaning Service did not know at the time of hiring his work force that there was union workers already in place at the job site.

If there was no anti union animus, then C & W Cleaning Service is free to set the terms and condition of employment under *Burns*. In addition, there would be no duty to bargain at that point as well.

Further, even arguendo, there was a good faith duty to bargain, a union needs to convey a demand for bargaining with a successor employer. It is customary for a union seeking recognition to inform C & W Cleaning Service that it represents a majority of employees. *See Burns Int'l supra at* 278-79. In conveying its intentions to the successor employer the union must suggest a meeting, specify the subjects of the meeting, and when or where the union would like to get together to trigger an employer's s 8(a)(5) obligation to bargain. *K & S Circuits, Inc.*, 255 N.L.R.B. 1270, 1297 (1981); *Sheboyan Sausage Co.,* 156 N.L.R.B. 1490, 1500-01 (1966).

In the instant case, C & W Cleaning Service was never contacted in writing about the desire to bargain. The union through a representative never communicated orally its specific intention of wanting to bargain. If the union does not clearly express its purpose, if it does not explicitly demand bargaining, it cannot now complain that C & W Cleaning Service refused to bargain in good faith.

Mr. Campbell testified that his bid of 1.478 million was based on hiring new employees at

80 percent of the prevailing wage and that he could not pay the prevailing wage of over $26.00 per hour and still make a profit. In fact he would lose about ninety thousand dollars on the contract. Thus, when he received the award on June 28, 2007, he did not even contemplate hiring the existing work force since his bid was calculated to make a razor thin profit margin only if he hired new employees. The status of the existing work force was simply irrelevant to Mr. Campbell determination to go outside and hire new employees. The only factors used by Mr. Campbell was the requirements of the bid and the exception that allowed C & W to just come in under the 1.5 million threshold thus waiving the bond requirement if he used a new work force only. In order to be considered a new hire, you had to be working less than thirty days.

Thus, even if there was violation, the result would have been the same. The bid was won on a shoe string budget. In fact, the original work site had fourteen employees. The current work force for the job site is eleven working only five hours a day instead of full-time. The profit margin for the company is extremely small. (They are close to losing money on this work site) The union workers at the existing work site by New York City Law would have to be paid over $26.00 per hour, thus causing C & W to lose money on the contract. The new workers are receiving a lower hourly wages. There would have been no possibility of an agreement being reached with the union in any event and thus they would not have been hired anyway. Put simply, the same action would have been taken regardless if they were in the union or not in the union. Thus, there is no reasonable cause to believe that there was a violation of the act.

  **B.**  **Just and Proper**

If there is reasonable cause to believe that unfair labor practices have been committed, one must next determine whether injunctive relief is "just and proper." <u>Angle</u>, 382 F.2d at 660. Specifically, the circumstances of the case must demonstrate that there exists a probability that the purposes of the Act will be frustrated unless temporary relief is granted <u>Id.</u>, 382 F.2d at 660. The relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the

Board and is not to be a substitute for the exercise of that power." Kobell v. Suburban Lines, Inc., 731 F.2d 1076, 1091 (3d Cir. 1984).

To satisfy the four-part test for injunctive relief, the Board must demonstrate: (1) a likelihood of success on the merits; (2) the potential for irreparable injury in the absence of relief; (3) that such injury outweighs any harm preliminary relief would inflict on the defendant; and (4) that preliminary relief is in the public interest. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir. 1991)).  A fifth factor Courts have utilized is whether there is a "continuing or repetitious pattern" *Sharp v. Parents in Cmty. Action, Inc.,* 172 F.3d 1034, 1040 (8th Cir. 1999) Other factors to consider are the geographical breath of the alleged violation, and the alleged degree of impairment of employee rights under the Act.

Regarding the first factor, "success on the merits" factor, the allegations of the complaint must be sufficiently strong that the Board likely will enter the final relief sought on a temporary basis through the Section 10(j) proceeding. The clarity of the alleged violations is an important factor in the 10(j) determination because interim equitable relief should be imposed on C & W Cleaning Service only when it is likely that the Board will impose such relief permanently.  As explained above, it was impossible to have an anti union animus when the bid at the time it was calculated was premised on hiring only new employees at eighty percent of the prevailing wage. The bid would not have been possible under 1.5 million (the bond threshold) if experienced workers were hired regardless of union status.  Further, at the time the work force was hired, C & W Cleaning Service did not know the job site had union workers.

Regarding the second factor, the irreparable harm to be demonstrated is not harm to individual employees; the Board must show a harm to the collective bargaining process or to other protected employee activities if a remedy must await the Board's full adjudicatory process.  Even assuming there is a substantial likelihood of success, there is no harm to the collective bargaining process that would be prejudiced if the Board awaits its fully adjudicatory process.

Regarding the third factor, the Court should consider whether interim relief would impose an unwarranted burden on C & W Cleaning Service, *Calatrello v. "Automatic" Sprinkler Corp.,* 55 F.3d 208, 215 (6th Cir. 1995); The Board should consider that this a relatively small company that works on a small profit margin.  There is no history of past abuses and C & W Cleaning Service has never dealt with the Union prior to this dispute in it seventeen years of business.  If the Board seeks to hire the union workers, this interim relief would create a hardship by displacing employees that are currently working at the job site, create problems in transitioning the new workers, create problems regarding supervision of those employees and completely disrupt the work site. It would also cause C & W to lose money on the contract and a lot of money if the Union contract is imposed and there is a requirement that they work full-time.

Finally, whether the public interest will be served if an injunction is granted.  *Hirsch v. Dorsey Trailers, Inc.,* 147 F.3d 243, 247 (3d Cir. 1998);   Here, the public interest would not be served in displacing workers prior to hearing being held.  If the Board does not sustain its burden at the hearing, who pays the displaced workers for losing their jobs and pay (not to mention disruption to their families caused by a sudden job loss) .  In addition, what public interest is served before a hearing decision in completely disrupting the work site and C & W Cleaning Service's operations by compelling them prior to a decision to employ the union workers at a significant loss. This would also cause eleven workers to placed on the unemployment line collecting unemployment insurance. (Even if one was inclined to compel C & W to hire union workers at a substantial loss to C & W, which as explained above is not appropriate, an examination should be done as to which of the fourteen workers would have obtained the eleven positions and who at of those eleven workers are currently unemployed. Only those workers who would have obtained the position and are still unemployed should even be considered for this extraordinary relief being contemplated and only be allowed to work five hours a day at 80 percent of the prevailing wage).

**4.     Conclusion**

    Based on the foregoing, it is respectfully submitted that the 10 (j) injunctive relief be denied.

Dated: New York, New York
       March 3, 2008

                                      Respectfully submitted,

                                      s/Stewart Lee Karlin, Esq.
                                    STEWART LEE KARLIN, ESQ.
                                    Attorney for Respondent
                                    9 Murray Street, Suite 4W
                                    New York, New York, 10007
                                    Tel: (212) 732-9450
                                    Fax: (212) 571-9893

## **CERTIFICATE OF SERVICE**

     I HEREBY CERTIFY that the foregoing answer was sent via fax to (212) 264-2450 and first class mail and ECF filing system to National Labor Relations Board, Region 2, 26 Federal Plaza, Room 3614, New York, N.Y. 10278 on this 3rd day of March, 2008.

                                      s/Stewart Lee Karlin, Esq.
                                    STEWART LEE KARLIN, ESQ,